## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BABAESU BEY,** | : | |
| **Plaintiff** | : | **No. 1:23-cv-00328** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **CO1 SHAY HOLT, <u>et</u> <u>al.</u>,** | : | |
| **Defendants** | : | |

### MEMORANDUM

Presently before the Court is Defendants' motion to dismiss pro se Plaintiff's First Amendment retaliation claims against several Defendants in his amended complaint. For the reasons set forth below, the Court will deny the motion.

## I.    BACKGROUND

Pro se Plaintiff Babaesu Bey ("Bey"), a convicted and sentenced state prisoner, commenced this action by filing a complaint which the Clerk of Court docketed on February 23, 2023. (Doc. No. 1.) In his complaint, Bey named as Defendants the Commonwealth of Pennsylvania Department of Corrections ("DOC") and George Little ("Little"), a former secretary of the DOC. (<u>Id.</u> at 5.) Bey also named as Defendants the following individuals, all of whom worked at Pennsylvania State Correctional Institution Mahanoy ("SCI Mahanoy") during the period relevant to his claims: (1) Superintendent Mason ("Mason"); (2) Deputy Superintendent Stetler ("Stetler"); (3) Deputy Superintendent Banta ("Banta"); (4) Deputy Superintendent White ("White"); (5) Captain Reed ("Reed"), the Captain of Security; (6) Lt. Cobian ("Cobian"); (7) Lieutenant Program Manager Chuma ("Chuma"); (8) Macknight ("Macknight"), a Program Manager; (9) Unit Manager Tobbias ("Tobbias"); (10) Unit Manager Kellner ("Kellner"); (11) Unit Manager Lotwick ("Lotwick"); (12) Correctional Officer Holt ("Holt"); and (13) Staff Assistant Ann Verbyla ("Verbyla"). (<u>Id.</u> at 1–5.)

In his complaint, Bey alleged that on October 28, 2022, Holt walked up to him, grabbed Bey's left wrist, and twisted his arm back "as if he was attempting to take [Bey] down." See (id. at 6). Holt then released Bey's arm and proceeded to "verbally assault[]" him. See (id.). This incident caused "serious injury" to Bey's left wrist and shoulder. See (id.).

Two (2) days later, Cobian began "initiating retaliatory actions against [Bey] because [he] reported the abuse of staff." See (id.). Cobian "filed a report[, thereby] putting [Bey] under investigation until she could find something to charge [him] with." See (id.). Reed approved this report despite being "presented with the fact that [Bey] . . . report[ed] being assaulted by staff." See (id. at 7).

Bey averred that Mason "promotes an atmosphere of lawlessness and zero accountability at SCI Mahanoy." See (id.). Mason knew that Bey did not violate any "rule" and "was only placed in the RHU because [he] reported being assaulted by staff." See (id.). In addition, Bey averred that Little and the DOC "did not have policies in place to protect [him] from retaliation after [he] reported being assaulted by a staff member." See (id. at 9).

Along with these events in October 2022, Bey alleged that on four (4) separate occasions in November 2022, members of SCI Mahanoy's Program Review Committee ("PRC"), which included White, Macknight, Tobbias, Lotwick, Banta, Stetler, Kellner, and Chuma, met and determined that, because Bey reported being assaulted by a staff member, his confinement in the RHU and Cobian's "search for something to charge [him] with were justified and warranted." See (id. at 8–9). Verbyla later transferred Bey "to a prison facility farther away from [his] family and loved ones." See (id. at 9).

Based on these allegations, Bey asserted claims under 42 U.S.C. § 1983 for unspecified constitutional violations against Defendants. (Id. at 1.) For relief, Bey requested that he be

transferred back to a prison closer to his family and friends and that he be provided the

opportunity to file criminal assault charges against Holt.  (Id. at 10.)  Bey also sought monetary

damages as well as the issuance of an order directing the DOC to "implement protections for

those who report being abused by staff to prevent retaliation in these matters."  See (id. at 10–

11).

On May 4, 2023, the Court issued an Order which, inter alia, directed the Clerk of Court

to send waiver of service forms to Defendants.  (Doc. No. 7.)  All Defendants except for Reed

waived service (Doc. No. 10), and those Defendants later filed a motion to dismiss the complaint

(Doc. No. 11) and a supporting brief (Doc. No. 12).  After receiving an extension of time to file a

brief in response to the motion to dismiss, Bey filed his opposition brief on August 25, 2023.

(Doc. No. 15.)

On March 29, 2024, the Court issued a Memorandum and Order which, inter alia, (1)

construed Bey's complaint as asserting Section 1983 claims for violations of the First, Eighth,

and Fourteenth Amendments to the United States Constitution, and (2) granted in part and denied

in part Defendants' motion to dismiss.  (Doc. Nos. 18–19.)  The Court granted the motion insofar

as Defendants sought dismissal of Bey's claims against (1) the DOC based on its Eleventh

Amendment immunity, (2) Little and Mason based on their lack of personal involvement in any

asserted constitutional violation, (3) Holt for excessive force in violation of the Eighth

Amendment, and (4) all Defendants for due process violations under the Fourteenth Amendment.

(Doc. Nos. 18 at 6–23; 19 at 1.)  The Court denied the motion insofar as Defendants moved for

dismissal of Bey's First Amendment claim against Cobian.  (Doc. Nos. 18 at 10–14; 19 at 1.)

The Court granted Bey leave to file an amended complaint within thirty (30) days and explained

to him that any amended complaint must include factually specific allegations and identify which

claim(s) he seeks to assert against each individual Defendant to comply with Federal Rule of Civil Procedure 8.  (Doc. Nos. 18 at 22–23; 19 at 1–2.)

After receiving an extension of time (Doc. Nos. 20–21), Bey filed an amended complaint which the Clerk of Court docketed on May 28, 2024.  (Doc. No. 22.)  In the amended complaint, Bey names as Defendants: (1) Mason; (2) Stetler; (3) Banta; (4) White; (5) Cobian; (6) Chuma; (7) Macknight; (8) Tobbias; (9) Kellner; (10) Lotwick; (11) Holt; and (12) Verbyla.[1]  (Id. at 1–6.) He no longer asserts claims against the DOC, Little, and Reed.  (Id.)

As for his factual allegations and legal claims, Bey alleges that on October 28, 2022, at approximately noon, he was standing in a single-file line in "Dining Hall #3" at SCI Mahanoy so he could go through security procedures prior to his release from his work detail in the dietary area.  See (id. at 7).  These security procedures required the inmate workers to pass a pat-down search by the civilian kitchen supervisors as well as to successfully go through a metal detector. (Id.)

While Bey was standing in line, a then-unknown person "came up from behind [him] and swiftly and violently grabbed [his] left wrist, twisted it behind [his] back while simultaneously pushing [his] shoulder down so that [his] wrist was in the air and [his] entire upper[]body was bent over at the waist."  See (id.).  Because Bey was unsure of who "grabbed [him] in such a vicious way, [he] turned [his] head back and saw" that Holt was the individual who grabbed him. See (id.).  Although Bey's "first reaction was to get down on the floor [because] . . . officers were coming to take [him] to the hole for something," once he noticed that Holt was "assaulting [him] . . . by himself," Bey asked Holt, "What's going on?"  See (id.).  At that point, Holt slowly

---

[1]  Bey also added first names for all Defendants, and he changed the spelling of Tobbias to "Tobias."  Regarding this latter change, the Court will continue to use "Tobbias" to refer to this Defendant in this Memorandum.

released Bey from his grip and said, "It did not look like [] you were paying attention to where you were going!"  See (id. at 7, 13).  Bey told Holt that he "could not just be walking around putting his hands on people like that."  See (id. at 13).  Holt responded by saying, "I don't know about you, but I do whatever I want around here."  See (id.).  Holt then walked away.  (Id.)

Although Bey was "stunned at the incident that just happened," he continued through the security process by being patted down and going through the metal detector.  See (id.).  Bey then exited the dining hall.  (Id.)  Immediately after exiting the dining hall, Bey heard Holt yell, "40, my man, what was all that bull-shit [sic] that you was [sic] talking inside of there[?]"  See (id.).  Bey looked over towards Holt and noticed that he was standing next to nonparty Correctional Officer Price.  (Id.)  Bey then walked to Holt's location and told him that he "was not talking shit[,] and like [he] said inside[,] you can't be walking eround [sic] just putting your hands on people."  See (id.).  Holt responded by stating, "I did what I did and you didn't stop me and nobody else stopped me[,] so who says that I can't do it."  See (id.).  Bey told Holt that he "needed to go back and read his own rule book because his own rules say that he can't be doing it," to which Holt responded, "If you could not stop me from putting my hands on you and nobody else stopped me, ain't no damn rules gonna [sic] stop me either!"  See (id.).

Bey avers that "[i]t was at this point that [he] began to quickly process the entirety of the situation."  See (id. at 14).  Bey describes his understanding of the "situation" as follows:

> Out of nowhere[,] . . . Holt walks up to me and physically assaults me and tells me that he can do whatever he wants, and then . . . Holt goes and gets one of his buddies and they are posted up outside of my work area like two goons waiting on me to leave work and now . . . Holt is out here talking big about putting his hands on me and how I didn't stop him and . . . I began to believe that . . . Holt was trying to goad me into a physical altercation.

See (id.).  Based on this understanding, Bey "shut up and walked away from them."  See (id.).

5

Once Bey walked away, Holt yelled, "Yeah, go back to your cell and write it up, that's what ya [sic] bitch-ass [sic] usually do right. Yeah, write it up, ain't nobody gonna [sic] do nothing, ain't nobody gonna [sic] do nothing to me!" See (id.). After hearing Holt, Bey responded, "I hope that you stand on everything that you just said!" See (id.). Bey then proceeded to his housing unit and later started preparing a grievance about the incident with Holt. See (id.). However, he did not finish it that day (which was a Friday), or over the next two (2) days. (Id.)

On Sunday afternoon, the block officer in Bey's housing unit told him that he had a medical pass to "go and sign some papers." See (id. at 15). Bey then changed his clothes, proceeded to the medical area, and handed his medical pass to the "officer in the bubble." See (id.). That officer made a phone call and told Bey that he needed to report to the security office. (Id.)

Bey walked to the security office where he encountered Cobian. (Id.) Cobian called Bey into the office and told him to "take a seat." See (id.). Cobian then picked up a piece of paper and told Bey, "I received a report today that you instigated a confrontation with one of my officers on Friday outside of dining hall #3." See (id.). Bey responded by stating, "Whoever [sic] gave you a report about a conversation that took place outside of dining hall #3 is conveniently leaving out the fact that one of your officers assaulted me inside of dining hall #3." See (id. at 8, 15). After Bey affirmed to Cobian that he had been assaulted by a correctional officer, Cobian told him that this was the first time she heard about it. (Id. at 15.)

Bey then told Cobian that she will be able to read about it in his grievance. (Id.) Cobian asked him whether he had filed a grievance, and Bey explained that he was "still typing it up." See (id.). Cobian informed Bey that she was going to have to place him in the Restricted

Housing Unit ("RHU") until she could investigate his claim of assault by an officer. (Id. at 16.) Bey responded by telling Cobian that she did not need to place him in the RHU because the entire event was on camera. (Id.) Cobian disagreed that the camera in the dining hall would have captured the incident because of where the incident occurred. (Id.)

Ultimately, Cobian told Bey that she was placing him in the RHU "because it was the only way to keep [him] safe in this facility." See (id.). Cobian then made a phone call after which several officers arrived to escort Bey to the RHU. (Id.) Bey was placed in the RHU and, later that night, he received an "Other Report" informing him that he "was placed in the RHU because [he] could not be safely housed in the general public [sic] and that [he] was under investigation until security could find something to charge [him] with." See (id.).

Once Bey was placed in the RHU, he "immediately fell into a state of depression" because he could not understand how the "victim" in the situation could be punished. See (id.). Bey anticipated that Mason would review his administrative custody placement within twenty-four (24) hours as she should have pursuant to DOC policy; however, "[a]fter 24 hours went by [Bey] realized that . . . Mason did not see things the way that [he] was hoping and praying that she would." See (id. at 16–17); see also (id. at 8 (alleging that "Mason acquiesced to and approved of Cobian's retaliatory actions and decided to continue [Bey's] confinement in the RHU until the security offices could find something to charge [him] with"). At that point, Bey focused his attention on the administrative custody hearing that he should have had within seven (7) days of placement in the RHU. See (id. at 17.) Yet, after two (2) weeks, he did not have his hearing. See (id.).

Although Bey alleges that he never had a hearing about his placement in the RHU, he avers that on November 3, 2022, the Program Review Committee ("PRC"), consisting of White,

7

Macknight and Tobbias, reviewed Bey's confinement and "acquiesced to and approved of . . . Cobian's retaliatory actions [by] continu[ing his] confinement in the RHU."  See (id. at 9).  On November 10, 2022, the PRC, this time consisting of White, Macknight, and Lotwick, reviewed Bey's confinement and "acquiesced to and approved of Cobian's retaliatory actions" by continuing his incarceration in the RHU.  See (id.).

Bey avers that he "never had the chance to finish the grievance that [he] started typing up," and he never submitted a grievance because he "believ[ed] that he would be released from the RHU before the time expired for [him] to submit a grievance concerning . . . Holt's assault." See (id. at 17).  Nevertheless, on his fifteenth day in the RHU, Bey filed his grievance because "it became clear [to him] that [he] was not gonna [sic] be getting out of the RHU"  See (id.).

Upon his sixteenth day in the RHU, Bey "automatically assumed that . . . Cobian requested an extension to [his] confinement in order to keep looking for something to charge [him] with."  See (id.); see also (id. at 10 (alleging that after being unable to locate anything upon which to charge Bey, "Cobian persisted in her retaliatory actions towards [him by] request[ing] a 15[-]day continuation of [Bey's] confinement" so she could continue to "search for something to charge hm with")).  Bey also "automatically assumed that . . . Mason approved . . . this request and granted . . . Cobian 15 more days to try and find something to charge [him] with."  See (id. at 17); see also (id. at 10 (alleging that Mason granted Cobian's request to continue Bey's RHU confinement thereby "acquiescing and approving of . . . Cobian's retaliatory actions towards [Bey]").  Bey then wrote to "security" and asked to press charges against Holt. See (id.).

On November 17, 2022, the PRC, consisting of Banta, Stetler, and Kellner, reviewed Bey's RHU confinement.  (Id. at 11.)  The PRC continued Bey's confinement in the RHU,

thereby "acquiesc[ing] and approv[ing] of . . . Cobian's retaliatory actions" towards him.  <u>See</u> (<u>id.</u>).  On November 22, 2022, the PRC, consisting of Banta, Macknight, and Chuma, evaluated Bey's confinement in the RHU.  (<u>Id.</u>)  They also continued Bey's placement in the RHU, which meant they were "acquiesc[ing] and approv[ing] . . . Cobian's retaliatory actions" towards him. <u>See</u> (<u>id.</u>).

After he had been in the RHU for thirty (30) days, Bey asked the block sergeant about being released from the RHU, and the block sergeant told Bey that "it would be looked into." <u>See</u> (<u>id.</u> at 18).  Bey avers that despite the block sergeant's representation, he "was never released and [he] was never given any explanation."  <u>See</u> (<u>id.</u>).

On the morning of his thirty-second day in the RHU, Bey once again spoke to the block sergeant about his continued incarceration in the RHU.  (<u>Id.</u>)  The block sergeant told Bey he would look into it, and on this occasion, the block sergeant told Bey that someone from the security office was coming to speak to him.  (<u>Id.</u>)  Later that morning, Bey was escorted from his cell to a multi-purpose room in the RHU where Cobian was waiting for him.  (<u>Id.</u>)  Cobian informed Bey that their review of his phone calls and emails did not result in any finding that would warrant charges being issued against him.  (<u>Id.</u>)  She also informed Bey that Holt placed an administrative separation against him, which meant that Bey would be transferred from SCI Mahanoy.  (<u>Id.</u>)  Bey believes that Holt did this to retaliate against him for reporting Holt's assault.  (<u>Id.</u> at 8.)

Once Bey learned that he was being transferred, he wrote to the library and requested the name and address of the individual "in charge of transfers."  <u>See</u> (<u>id.</u> at 19).  Bey received a response indicating that this individual was "Tabb Bickell[ ("Bickell"),] Department Secretary for Institutional Operations."  <u>See</u> (<u>id.</u>).  Bey wrote to Bickell and provided him with a "detailed

account of [his] situation," which included, inter alia, Bey's incentive-based transfer to SCI Mahanoy in 2019, after which he remained misconduct-free and had positive block and work reports.  See (id.).  It also included everything that happened since October 28, 2022, starting with Holt's assault.  See (id.).  Bey requested that his transfer "should not equate to a disciplinary transfer which would have [him] transferred away from [his] home region."  See (id.).

Verbyla responded to Bey's written correspondence.  (Id.)  In her response, Verbyla acknowledged that Bey was requesting to remain in the eastern region, and she informed Bey that she would review and respond to his request.  (Id.)  Bey avers that on January 26, 2023, his "incentive[-]based transfer was effectively rescinded and [he] was demotionally [sic] transferred from SCI[]Mahanoy to SCI[]Rockview, which is a facility outside of [his] home region."  See (id. at 20).  Bey alleges that "Verbyla prepared, filed and processed the necessary paperwork" resulting in his rescission of his incentive[-]based transfer, the termination of his employment pay rate, and his transfer away from his home region.  See (id. at 12).

Based on these factual allegations, Bey asserts a Section 1983 claim against Holt for his use of excessive force in violation of the Eighth Amendment and First Amendment retaliation claims against all Defendants.  (Id. at 23–34.)  For relief, Bey seeks an order allowing him to talk to the Pennsylvania State Police so he can file assault charges against Holt, an order requiring the DOC to transfer him back to a correctional facility in the eastern region, since it is his home region, and compensatory damages.  (Id. at 21, 36.)

On June 11, 2024, Defendants filed the instant motion to partially dismiss Bey's amended complaint (Doc. No. 23) and, after receiving an extension of time (Doc. Nos. 24, 25), they filed a brief in support of their motion on July 10, 2024.  (Doc. No. 26.)  Bey also sought and received an extension of time to file a brief in opposition to the motion (Doc. Nos. 27–29), and he filed his

opposition brief on August 8, 2024 (Doc. No. 30).  Defendants filed a reply brief in further

support of their motion on August 23, 2024.  (Doc. No. 31.)  Bey then filed a surreply brief on

September 13, 2024.[2]  (Doc. No. 32.)  Defendants' motion to partially dismiss is ripe for

disposition.

## II.    LEGAL STANDARD

### A.    Motion to Dismiss Under Rule 12(b)(6)

Federal notice and pleading rules require the complaint to provide the defendant notice of

the claim and the grounds upon which it rests.  See Phillips v. County of Allegheny, 515 F.3d

224, 232 (3d Cir. 2008).  The plaintiff must present facts that, accepted as true, demonstrate a

plausible right to relief.  See Fed. R. Civ. P. 8(a).  Although Federal Rule of Civil Procedure

8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled

to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure

12(b)(6) for "failure to state a claim upon which relief can be granted."  See Fed. R. Civ. P.

12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all

factual allegations in the complaint and all reasonable inferences that can be drawn from them,

viewed in the light most favorable to the plaintiff.  See In re Ins. Brokerage Antitrust Litig., 618

---

[2]  Bey filed this surreply brief without first obtaining leave of Court.  See M.D. Pa. L.R. 7.7 ("A brief in reply to matters argued in a brief in opposition may be filed by the moving party within fourteen (14) days after service of the brief in opposition.  No further briefs may be filed without leave of court." (emphasis added)).  Although the Court has considered Bey's surreply on this occasion, as it also appears that Defendants filed their reply brief a day late, see id., Bey's pro se status is not an acceptable excuse for his failure to comply with the applicable rules.  See Vogt v. Wetzel, 8 F.4th 182, 185 (3d Cir. 2021) (explaining that pro se litigants "'cannot flout procedural rules—they must abide by the same rules that apply to all other litigants'" (quoting Mala v. Crown Bay Marina, Inc., 704 F.3d 239, 245 (3d Cir. 2013))).  Bey is encouraged to read the copies of the Federal and Local Rules sent to him a day after the docketing of his complaint.  (Doc. No. 2.)

F.3d 300, 312 (3d Cir. 2010).  The Court's inquiry is guided by the standards of <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), and <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009).  Under <u>Twombly</u> and <u>Iqbal</u>, pleading requirements have shifted to a "more heightened form of pleading."  <u>See</u> <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir. 2009).  To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible.  <u>See id.</u>  The plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct.  As the Supreme Court instructed in <u>Iqbal</u>, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'"  <u>See</u> <u>Iqbal</u>, 556 U.S. at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

Accordingly, to determine the sufficiency of a complaint under <u>Twombly</u> and <u>Iqbal</u>, the Third Circuit Court of Appeals has identified the following steps a district court must take under Rule 12(b)(6): (1) identify the elements a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief."  <u>See</u> <u>Santiago v. Warminster Twp.</u>, 629 F.3d 121, 130 (3d Cir. 2010) (quoting <u>Iqbal</u>, 556 U.S. at 679).  When following these steps, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  <u>See</u> <u>Mayer v. Belichick</u>, 605 F.3d 223, 230 (3d Cir. 2010) (citing <u>Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993)).

In addition, in the specific context of pro se prisoner litigation, the Court must be mindful that a document filed pro se is "to be liberally construed."  <u>See</u> <u>Estelle v. Gamble</u>, 429 U.S. 97,

106 (1976); <u>Higgs v. Att'y Gen.</u>, 655 F.3d 333, 339–40 (3d Cir. 2011) (explaining that "when presented with a pro se litigant, we have a special obligation to construe [their] complaint liberally" (citation and internal quotation marks omitted)). Therefore, a pro se complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers." <u>See</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (internal quotation marks omitted) (quoting <u>Estelle</u>, 429 U.S. at 106). This means the Court must always "remain flexible, especially 'when dealing with imprisoned pro se litigants . . . .'" <u>See</u> <u>Vogt</u>, 8 F.4th at 185 (quoting <u>Mala</u>, 704 F.3d at 244–45)). Moreover, when construing a pro se complaint, the Court will "apply the relevant legal principle even when the complaint has failed to name it." <u>See</u> <u>Mala</u>, 704 F.3d at 244.

### B. Section 1983

Section 1983 is the statutory vehicle by which private citizens may seek redress for violations of federal constitutional rights committed by state officials. <u>See</u> 42 U.S.C. § 1983. This statute states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

<u>See</u> <u>id.</u> "Section 1983 is not a source of substantive rights," but is merely a means through which "to vindicate violations of federal law committed by state actors." <u>See</u> <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting <u>Gonzaga Univ. v. Doe</u>, 536 U.S. 273, 284–85 (2002)). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged

13

deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).

## III.    DISCUSSION

### A.    The Parties' Arguments

In their motion to partially dismiss Bey's amended complaint, Defendants indicate that they are not seeking dismissal of Bey's Eighth Amendment excessive force claim against Holt or his First Amendment retaliation claim against Cobian.  (Doc. No. 26 at 2 n.3.)  Rather, they move for dismissal with prejudice of Bey's First Amendment retaliation claims against Mason, Banta, White, Stetler, Macknight, Kellner, Tobbias, Lotwick, Chuma, and Verbyla due to their lack of personal involvement.  (Id. at 5, 7–11.)  As to those individual Defendants whose involvement consisted of reviewing Bey's continued RHU confinement as members of the PRC—Mason as well as Banta, White, Stetler, Macknight, Kellner, Tobbias, Lotwick, Chuma (the "PRC Defendants")—Defendants argue that Bey does not assert facts showing that they were aware of Cobain's alleged retaliatory purpose in placing Bey in the RHU.  (Id. at 9.)  Instead, his allegations demonstrate merely that they participated in an "after-the-fact review" of his RHU (or administrative custody ("AC")) status, which is insufficient to show their personal involvement. See (id.).  Regarding Verbyla, Defendants characterize her alleged conduct as simply "reviewing and processing [Bey's] transfer," which they argue is insufficient to show her personal involvement in Holt's alleged retaliatory motive in seeking Bey's transfer by filing an administrative separation against him.  See (id. at 10).  Additionally, Defendants contend that "there is simply no logical or legal justification to hold clerical staff liable for merely processing paperwork that effectuated an adverse action" because it "would subject numerous government administrators to strict liability in Section 1983 cases simply because they were part of the

bureaucratic chain that implemented an otherwise valid action unknowingly at the behest of a bad actor."  See (id.).

In response to Defendants' arguments, Bey contends that he sufficiently alleges Mason, the PRC Defendants, and Verbyla's personal involvement for purposes of his retaliation claims in his amended complaint.  (Doc. No. 30 at 7.)[3]  Regarding Mason and the PRC Defendants, Bey states that his allegations show that they "were personally involved in assuring that [he] remained in [AC] until . . . Cobian could find something to charge [him] with, in retaliation for [him] reporting" Holt's assault.  See (id.).  He points out that the DOC's process related to AC, "by its very design," requires the personal involvement of the facility manager (Mason) and the PRC members insofar as the facility manager is supposed to conduct an independent review of the inmate's placement in [AC] and decide whether to continue it or return the inmate to general population.  See (id. at 8).  In addition, the PRC members are supposed to "'personally' review the rationale submitted for the inmate's AC placement and reach a decision whether a valid security [reason] exists to continue the inmate's AC placement."  See (id.).  Bey also indicates that at least one district court has determined that a plaintiff-inmate sufficiently alleged PRC members' personal involvement when the members reviewed the plaintiff-inmate's administrative custody placement and kept him there.  (Id. (citing Naranjo v. Ivcic, No. 21-cv-00072, 2022 WL 875927 (W.D. Pa. Mar. 2, 2022), report and recommendation adopted sub nom., Naranjo v. Ivicic, 2022 WL 874304 (W.D. Pa. Mar. 24, 2022))).[4]

_____

[3]  Bey devotes several pages of his opposition brief to "correct the record" regarding Defendants' recitation of his allegations and claims in their brief in support of their motion to dismiss.  (Id. at 1–5.)  While the Court recognizes and appreciates Bey's concerns in this regard, the Court has not considered Defendants' recitation in addressing the merits of their partial motion to dismiss.

[4]  In his surreply brief, Bey asserts that the Naranjo case is a "Third Circuit" case.  See (Doc. No. 32 at 3).  To the extent that Bey is referring to the Western District's location within the Third

As for Verbyla, Bey points out that he alleges that after Cobain could not find anything with which to charge him, Verbyla processed Mason's administrative transfer petition, in a manner which caused Bey to lose his incentive-based transfer, lose his prison detail pay rate, and be transferred to a correctional facility outside his home region, in retaliation for him reporting Holt's assault.  (Id. at 7.)  Bey disputes Defendants' contention that Verbyla simply "process[ed] paperwork," because "the procedures . . . govern[ing] the DOC's Permanent Administrative Transfer Policy require[] so much more than [that]."  See (id. at 10).  Bey contends that Verbyla could have determined that Mason's petition to transfer him was inappropriate and denied it. (Id.)  Similar to his arguments pertaining to Mason and the PRC Defendants, Bey asserts that the DOC's policy relating to administrative transfers necessarily means that Verbyla was personally involved in retaliating against him.  (Id.)

In Defendants' reply brief, they argue that Bey's allegations that he never had a hearing or met with the PRC Defendants after Cobain placed him in the RHU is contradicted by his averments identifying the individuals and dates of the PRC Defendants' meetings.  (Doc. No. 31 at 2.)  Defendants reassert that Bey has not sufficiently alleged the PRC Defendants' personal involvement through their "after-the-fact review," consisting of holding hearings and approving his continued placement in AC status.  See (id. at 2–3).  Concerning Verbyla, Defendants contend that Bey improperly seeks to hold her liable simply because she "receiv[ed] his letter complaint and allegedly fail[ed] to properly address his concerns."  See (id. at 3).

---

Circuit, he is correct.  On the other hand, to the extent that Bey believes that this is a decision by the Third Circuit Court of Appeals, which is binding on this Court, he is incorrect.  While this Court may consider the Western District's decision as persuasive authority, it does not constitute binding authority.

Bey submitted a surreply brief, in which he primarily points out that he learned about the names of the PRC members and the dates of their meetings through the DC-141, Part 3 forms that he was provided with following their meetings, and which he attaches to his surreply brief. (Doc. No. 32 at 2, 8–11.)  Bey maintains that he did not have any hearing on his administrative custody status or meet with the PRC Defendants during his time in the RHU.  (Id. at 2.)

### B.    Personal Involvement Under Section 1983

A plaintiff asserting a Section 1983 claim must allege the personal involvement of each defendant in the alleged constitutional violation; in other words, the plaintiff must state how each defendant was involved in the events and occurrences giving rise to the claims in the operative complaint.  See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable.); Iqbal, 556 U.S. at 676 (explaining that "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution").  Liability under Section 1983 cannot be predicated on respondeat superior.  See Chavarriaga v. N.J. Dep't of Corr., 806 F.3d 210, 227 (3d Cir. 2015) ("[Plaintiff] cannot predicate liability on her § 1983 claims on a respondeat superior basis." (citing Rode, 845 F.2d at 1207) (emphasis omitted)); Robinson v. Delbalso, No. 22-2378, 2022 WL 17248100, at *2 (3d Cir. Nov. 28, 2022) (unpublished) ("We agree with the District Court that Robinson's second amended complaint did not state a plausible claim for relief. First, he failed to allege the defendants' personal involvement, and he cannot predicate liability on his § 1983 claims on a respondeat superior basis." (internal citations omitted)).

If a plaintiff seeks to hold a supervisory official liable for unconstitutional acts by their subordinates, the plaintiff's allegations must satisfy one of two theories of supervisory liability:

first, "[i]ndividual defendants who are policymakers may be liable under § 1983 if it is shown

that such defendants, with deliberate indifference to the consequences, established and

maintained a policy, practice or custom which directly caused [the] constitutional harm[;]" and

second, "a supervisor may be personally liable under § 1983 if he or she participated in violating

the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge

of and acquiesced in his subordinates' violations."  See A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv.

Det. Ctr., 372 F.3d 572, 586 (3d Cir. 2004) (citation omitted); Barkes v. First Corr. Med., Inc.,

766 F.3d 307, 316 (3d Cir. 2014) (explaining requirements for supervisory liability in section

1983 claim and describing "two general ways in which a supervisor-defendant may be liable for

unconstitutional acts undertaken by subordinates"), rev'd on other grounds sub nom., Taylor v.

Barkes, 575 U.S. 822 (2015).

To allege a plausible claim for supervisory liability under the first theory—the policy-

and-practice strand of supervisory liability—a plaintiff must "identify the specific supervisory

practice or procedure that the supervisor failed to employ."  See Chavarriaga, 806 F.3d at 227

(quoting Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2001)).  The plaintiff must also

show that:

> [(1)] the existing custom and practice without the identified, absent custom or
> procedure created an unreasonable risk of the ultimate injury, [(2)] the supervisor
> was aware that this unreasonable risk existed, [(3)] the supervisor was indifferent
> to the risk[,] and [(4)] the underling's violation resulted from the supervisor's
> failure to employ that supervisory practice or procedure.  Put another way, the
> inmate must identify the supervisor's specific acts or omissions demonstrating the
> supervisor's deliberate indifference to the inmate's risk of injury and must establish
> a link between the supervisor, the act, and the injury.

See id. (quoting Brown, 269 F.3d at 216).  For the second theory of supervisory liability—

participating in, directing others to, or knowledge and acquiescence of constitutional violation—

generalized allegations that a supervisory defendant is "in charge of" or "responsible for" an

18

office or facility are insufficient to allege personal involvement in an underlying constitutional violation.  See Saisi v. Murray, 822 F. App'x 47, 48 (3d Cir. 2020) (unpublished) ("Saisi asserted that some defendants were in charge of agencies that allowed this to happen, and that liability stemmed merely from defendants' 'belief' that their conduct would be 'tolerated.' However, a director cannot be held liable 'simply because of [their] position as the head of the [agency].'" (quoting Evancho v. Fisher, 423 F.3d 347, 354 (3d Cir. 2005))); Zigler v. Warren, No. 21-cv-19474, 2022 WL 903383, at *2 (D.N.J. Mar. 28, 2022) ("In simpler terms, a supervisor is not liable for the unconstitutional conduct of his employees solely because he is a supervisor."). Additionally, "[a]lthough a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive." See Chavarriaga, 806 F.3d at 222 (citing Baker v. Monroe Twp., 50 F.3d 1186, 1194 (3d Cir. 1995); Rode, 845 F.2d at 1201 n.6).

    **C.**    **Analysis**

Defendants move for dismissal of Bey's First Amendment retaliation claims against the PRC Defendants and Verbyla only due to a lack of their personal involvement.[5]  Therefore, the analysis here is limited only to the issue of whether Bey has sufficiently alleged the personal involvement of the PRC Defendants and Verbyla in an alleged constitutional violation in his amended complaint.  As explained below, the Court concludes that Bey has sufficiently alleged the personal involvement of these Defendants.

---

[5] Defendants have not posited any argument for dismissal of Bey's First Amendment retaliation claim against Holt, see (Doc. No. 22 at 33 (alleging grounds for First Amendment retaliation claim against Holt); as such, the Court has not addressed this claim in this Memorandum.

In reaching this conclusion, the Court notes that Bey has <u>not</u> plausibly alleged the personal involvement of these Defendants in <u>Cobain's</u> alleged retaliation against him.  In this regard, Bey does not allege that Mason, the PRC Defendants, or Verbyla were personally involved in his initial placement in the RHU.  Although Bey alleges that Mason and the PRC Defendants "approved of and acquiesced in" Cobain's retaliation, he does not allege any facts showing that they had contemporaneous, personal knowledge of Cobain's decision to place him in the RHU on October 30, 2022.[6]  <u>See</u> <u>Evancho</u>, 423 F.3d at 353 (concluding that plaintiff failed to sufficiently allege supervisory official's personal involvement in her allegedly retaliatory transfer where plaintiff "did not allege any facts indicating that [the supervisory official] personally directed her transfer" and her amended complaint "does not contain even a remote suggestion that [the supervisory official] had contemporaneous, personal knowledge of her transfer and acquiesced in it"); <u>Rode</u>, 845 F.2d at 1207 ("Allegations of participation or actual knowledge and acquiescence . . . must be made with appropriate particularity." (citations omitted)); <u>see also</u> <u>Williamson v. Garman</u>, No. 15-cv-01797, 2017 WL 2702539, at *3 (M.D. Pa. June 22, 2017) ("Contemporaneous, personal knowledge and acquiescence, not after the fact knowledge, is required." (citing <u>Rode</u>, 845 F.2d at 1207; <u>Evancho</u>, 423 F.3d 347)).  Even if Bey had included such factual allegations, he does not allege that Mason or the PRC Defendants were Cobain's supervisors.[7]  <u>See</u> <u>Gannaway v. Prime Care Med., Inc.</u>, 150 F. Supp. 3d 511, 546 (E.D.

---

[6]  It is arguable that Bey's allegations of Mason and the PRC Defendants' approval and acquiescence in Cobain's conduct are "legal conclusion[s] posing as a factual assertion, which does not suffice."  <u>See</u> <u>Brown v. Louisville-Jefferson County Metro Gov't</u>, No. 19-cv-00906, 2020 WL 4432412, at *2 (W.D. Ky. July 31, 2020).

[7]  The Court recognizes that as Superintendent of SCI Mahanoy, Mason likely was Cobain's supervisor.  However, Bey does not allege that Mason was Cobain's supervisor in his amended complaint.

Pa. 2015) ("Acquiescence requires both contemporaneous knowledge of the alleged wrongdoing and direct supervisory authority over the subordinate actor." (citing Rode, 845 F.2d at 1207–08)), aff'd sub nom. Gannaway v. PrimeCare Med., Inc., 652 F. App'x 91 (3d Cir. 2016) (unpublished).

Nevertheless, as Bey points out in both his opposition and surreply briefs, his retaliation claims against Mason, the PRC Defendants, and Verbyla involve separate acts of retaliation relating to his reporting of Holt's alleged assault. (Doc. Nos. 30 at 8–12; 32 at 2–5.) Those acts include Mason and the PRC Defendants determining that Bey remain confined to the RHU, and Verbyla transferring him to a correctional institution outside of his home region and causing him other losses, such as the loss of his pay rate and incentive-based transfer.[8] (Doc. No. 22 at 8–12, 16–20, 29–33.) These alleged acts are sufficient at this early stage to show the personal involvement of these Defendants for purposes of Section 1983. See Naranjo, 2022 WL 875927, at *4 ("Plaintiff claims that he was kept in the RHU in retaliation for filing a lawsuit and grievances, and that [the defendant PRC member[ participated in his administrative custody hearings and th[e] decision [to keep him in the RHU]. Construing Plaintiff's pro se complaint liberally, he sufficiently pleads [this defendant's] personal involvement."); see also Laird v. Terra, No. 23-cv-03249, 2024 WL 388376, at *7 (E.D. Pa. Jan. 31, 2024) (determining that

_____

[8] In his opposition brief and surreply brief, Bey asserts several factual allegations that are not included in his amended complaint. Those factual allegations generally relate to the roles and duties Mason and the PRC Defendants had regarding his continued placement in the RHU. See, e.g., (Doc. No. 30 at 8 (indicating that within twenty-four (24) hours of an inmate's placement in the RHU, Mason "must 'personally' review the rationale for this placement . . . and make an independent determination whether to continue the inmate's AC status or release the inmate from AC status"); id. at 10 (identifying what Verbyla had to consider when deciding whether to approve Bey's transfer from SCI Mahanoy)). Although these allegations are not in the amended complaint, the Court finds that the totality of Bey's allegations in the amended complaint are sufficient to illustrate the type of retaliation claims Bey asserts in this case.

21

plaintiff sufficiently pleaded PRC members' personal involvement when they "[d]irectly order[ed] plaintiff to] stay in solitary confinement"); cf. Brown v. Hill, No. 10-cv-02612, 2016 WL5461986, at *3 (M.D. Pa. Sept. 29, 2016) (permitting plaintiff's First Amendment retaliation claim to proceed against, among others, the "Administrative Assistant in the DOC's Office of Population Management, who is authorized to approve or disapprove transfer requests, [and who] also reviewed and approved the transfer request").  Accordingly, the Court will deny Defendants' motion to dismiss Bey's First Amendment retaliation claims against Mason, the PRC Defendants, and Verbyla in his amended complaint.[9]

## IV.    CONCLUSION

For the reasons set forth above, the Court will deny Defendants' motion to dismiss Bey's First Amendment retaliation claims against Mason, the PRC Defendants, and Verbyla in his amended complaint.  An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania

---

[9]  Although the Court will deny Defendants' motion, nothing in this Memorandum should be construed as pertaining to the merits of Bey's First Amendment retaliation claims against Mason, the PRC Defendants, or Verbyla.  Defendants may reraise the issue of their personal involvement should discovery reveal evidence inconsistent with Bey's allegations about their involvement in his continued placement in the RHU or his transfer from SCI Mahanoy.